UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No. | S1-4:17CR00273 RLW/DDN |
| | ) | | |
| NAKIA PHILLIPS, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## GOVERNMENT'S TRIAL BRIEF

COMES NOW the United States of America, by and through its attorneys Jeffrey B. Jensen, United States Attorney for the Eastern District of Missouri, and Colleen C. Lang, Assistant United States Attorney for said District, and submits its trial brief, outlining the anticipated testimony of witnesses and potential evidentiary issues in the upcoming trial of the above-captioned matter.

## PROCEDURAL HISTORY

On June 14, 2017, the defendant was indicted in this case by a federal grand jury on Count I: Production of Child Pornography and Count II: Sex Trafficking of a Minor.   The defendant was arraigned on June 27, 2017, and given until August 9, 2017, to file pretrial motions.   The defendant filed pre-trial motions to suppress evidence on August 1, 2017. Subsequently, an evidentiary hearing was held on October 2, 2017.   The government presented evidence and counsel for defendant cross-examined the government's witnesses.    At the conclusion of the evidentiary hearing, all parties indicated that they had no further evidence to offer, and Judge Noce took the matter under submission.

1

Following, in a written order dated November 6, 2017, Judge Noce recommended that the defendant's motion to suppress evidence and statements be denied.    Judge Noce ordered that the parties had fourteen (14) days in which to file objections to the Report and Recommendation, and that failure to file objections within that time could constitute a waiver of the right to file objections.    On December 4, 2017, this Honorable Court entered an order adopting the Report and Recommendation issued by Judge Noce, and denied the defendant's motion to suppress evidence and statements.

A status conference regarding setting a trial date was heard in front of this Court on December 6, 2017.    At the status conference, the defendant waived his right to speedy trial. The matter was subsequently set for jury trial the week of March 12, 2018.    The Government presented the case to the federal grand jury again on February 21, 2018.    The Grand Jury added two counts of Production of Child Pornography for videos of the victim engaged in sex acts subsequently located on the defendant's cell phone.

## CHARGES

1.      <u>Count One</u>: Sexual Exploitation of a Minor/Production of Child Pornography in violation of Title 18 U.S.C. § 2251(a) and 2251(e).

2.      <u>Count Two</u>: Sexual Exploitation of a Minor/Production of Child Pornography in violation of Title 18 U.S.C. § 2251(a) and 2251(e).

3.      <u>Count Three</u>: Sexual Exploitation of a Minor/Production of Child Pornography in violation of Title 18 U.S.C. § 2251(a) and 2251(e).

4.      <u>Count Four</u>: Sex Trafficking of a Minor in violation of Title 18 U.S.C. §§ 1591(a)(1) and 1594(a).

## STATEMENT OF FACTS

The United States expects the evidence will show that the defendant be-friended a fifteen year old female child.   He then forced the fifteen year-old into prostitution, as well as, made the child commit sex acts on him.   The defendant used his ZTE-brand cell phone to take sexually explicit pictures of the child's genitals, and to produce videos of the child engaged in sex acts.   That ZTE cell phone was produced outside of the state of Missouri and has traveled in interstate commerce.

### Background

a.   Victim Reports Crime at the Hospital.

On September 7, 2016, at approximately 6:00 a.m., Farmington Police Officer Eric Spiker was dispatched to Parkland Hospital in Farmington, Missouri, in reference to a sexual offense.   SANE nurse Kathy Ferguson reported to police that a fifteen-year-old juvenile, "S.J.," reported that she had been sexually assaulted by thirty-seven-year old Nakia Phillips, the defendant. Specifically, S.J. told Nurse Ferguson and Officer Spiker that on August 10, 2016, she met the defendant through a family member.   Later, the victim saw the defendant driving and the defendant offered her ride to a relative's home. S.J. got in the car, but the defendant did not drive her to the relative's home and instead took her to back to his apartment.   At the apartment, the defendant offered the victim some food, a soda, and a milkshake. After S.J. drank the soda and milkshake she felt dizzy and then woke up the next morning still in the apartment, but without any clothes on.   The victim reported that the defendant showed the victim a handgun that he owned. At some point soon after, the defendant then took the victim up to St. Louis and bought her a dress. In St. Louis, the victim was forced to walk the street and have sex with a man

3

for $200. She was taken back to Farmington, where she would be at the defendant's apartment for days at a time.   The victim reported that the defendant had sex with her multiple times, including as recent as September 6, 2017, in his apartment.   A sexual assault kit (commonly referred to as "rape kit") was performed on S.J.   S.J.'s clothing was seized. Photographs were taken of injuries on S.J.'s body at the hospital.

b. <u>Victim Reports Crime to Police.</u>

Later on September 7, 2016, Sgt. Tim Porter of the Farmington Police Department met with S.J. at the Farmington Police Department to follow up on her earlier allegations. S.J. picked the defendant out of a photo lineup. Sgt. Porter recorded their interview. S.J. told Sgt. Porter that she had met the defendant sometime before August 10, 2016. She remembered meeting him through a relative and she told the defendant that she was fifteen years old.   S.J. reported that on August 10, 2016, she was walking to her grandmother's home when the defendant pulled up in his car and asked her if she needed a ride. She agreed to the ride. However, rather than taking her to the grandmother's home, the defendant took S.J. to his apartment. At his apartment, 1502 N. Washington Street, #57, Farmington, Missouri, the defendant gave S.J. fast food including a soda and a milkshake. She said the drinks made her fall asleep on the couch at the defendant's apartment and she woke the next day with no clothes on. The second or third day after this, the victim reported that the defendant bought her a short dress in the St. Louis area and instructed her to stand on the corner and wait for a car to pull up.   She was paid $200 to perform oral and vaginal sex on a man in a car.   She then went back to the defendant's car and he took the money from her.   She further reported an incident of the defendant attempting to prostitute her at a truck stop.   S.J. also stated that the defendant's ex-girlfriend, "Brandi," also took her to a home

4

in St. Louis where she had sex with male named "Douglas" for money. Brandi took that money from S.J.

S.J. remembered being taken to a comedy club in the Florissant area on a Sunday owned by a man named, "Jesse." She was forced to have sex with "Jesse."   She also remembered being taken to an adult entertainment store in St. Louis called "Pure Pleasures" by the defendant.   At Pure Pleasures, people watched the defendant perform sex acts on S.J. She stated the defendant got paid for this.   The next night, Monday, she remembered going back to St. Louis. The following day, the defendant took her back to her mother's home in Farmington. She returned to high school on Wednesday, but the defendant picked her up from high school that day.   The defendant took her back to St. Louis to "Douglas'" home and he took back to Pure Pleasure a couple of times.

S.J. also reported to Sgt. Porter that she remembered the defendant taking her to the Galleria shopping mall in St. Louis.   She stated that went into a couple of stores and then he bought her food at the food court.

While with the defendant, S.J. used drugs and alcohol that was often provided to her from the defendant. The drugs included marijuana, "ice," and heroin. The defendant also sold marijuana.   The victim remembered the defendant taking her to a hotel near the St. Louis Airport where he had sex with her. She remembered the defendant taking her to the "OZ nightclub" in Illinois.   S.J. told Sgt. Porter that the defendant worked at Domino's Pizza. The victim also reported that the defendant had taken photographs of her naked with his cell phone.

At some point on or around September 6 or 7, 2016, S.J.'s mother and step-father found out where she was and was able to get her from the defendant's apartment. They took her to the

hospital.   S.J. left a bag of clothing at the defendant's apartment. These clothes are eventually picked up by a friend of S.J., named Shawn Minner. Shawn Minner gave the bag of clothing to the victim's mother. On October 16, 2016, the victim's mother turned the clothing over to law enforcement, who then sent the clothing to the Missouri State Highway Patrol Crime Lab.

c.   <u>Defendant's Arrest.</u>

Around 3 p.m. on September 7, 2016, Farmington Police Lieutenant Jeff Crites went by the defendant's apartment while doing investigating this case. Lt. Crites was in an unmarked car and saw the defendant loading bags into his car's trunk.   Lt. Crites talked to Sgt. Porter who told Lt. Crites to arrest the defendant based on S.J'.s allegations. Lt. Crites radioed for a marked police car to assist. The defendant began to leave the apartment complex so Lt. Crites followed and activated his lights. The defendant took off speeding at rates of 80 to 90 MPH. Lt. Crites lost sight of the defendant fleeing north on Missouri Highway D. Bonne Terre Police saw the defendant and picked the pursuit. Defendant fled at speeds up to 115 mph. The Jefferson County Sheriff's Department deployed spike strips, which the defendant ran over, after the defendant's car could no longer drive, he pulled off the road, got out of the car, and ran towards some woods, but he was stopped and arrested by law enforcement. The defendant's car was impounded. Lt. Crites seized three cell phones were from the front passenger side of the defendant's car.   Also in the defendant's car was the defendant's identification.

On September 12, 2016, after receiving a valid state search warrant, the Farmington Police executed a search of the defendant's apartment. They took photos of the inside of the defendant's apartment and located a receipt from the Galleria that supported S.J.'s account of what had happened.   Sgt. Porter went to the jail and interviewed the defendant about allegations.

Before the interview, the defendant was read his *Miranda* rights, understood them, and agreed to

waived those rights.   The defendant admitted to knowing S.J., but denied having sex with her or

providing her drugs.

    d.   <u>Searches of the Cell Phone by Law Enforcement.</u>

On October 21, 2016, Sgt. Porter applied for and was granted a state search warrant to

search the defendant's cell phones that were located in his car on September 8, 2016. A logical

search of the cell phones was performed by Sgt. Porter in October of 2016.

Back on September 7, 2016, U.S. Probation Officer Lisa Haar[1] (hereafter "USPO Haar")

had been contacted by Sgt. Porter and informed that the defendant was under investigation for a

sexual assault of a minor female and was in the midst of high-speed chase with officers.   Also

on September 7, 2016, USPO Haar had learned that the defendant had terminated his

employment weeks earlier and had not notified her of the change.     USPO Haar relayed these

alleged supervised release violations to Judge John Ross. That same day, Judge John Ross issued

a warrant for the defendant's arrest based on numerous alleged supervised release violations.

The defendant was formally taken into federal custody in January of 2017.[2]   On February 6,

2017, the defendant's cell phones were taken to the United States Probation and Parole office in

St. Louis. United States Probation Officer Steve Holmes analyzed the cell phones and found

images S.J.'s genitals on one of the defendant's cell phones, a ZTE prestige smart phone

---

[1] The defendant was and still is on federal supervised release in cause number 4:12CR0161 JAR after pleading guilty in 2012 to a federal sex offender registration violation of Title 18 USC Section 2250(a).

[2] Between the defendant's arrest on September 7, 2016, and January of 2017, the defendant was in jail in State custody.

(hereafter "ZTE cell phone").   Also on the phone were text messages relevant to the investigation against the defendant.   An examination of the internet history on the phone revealed activity on the website "backpages.com" for escorts in St. Louis, Southwest Missouri, Chicago, Memphis and Atlanta. Emails on the cell phone showed defendant created a backpages.com account.

On March 16, 2017, FBI Special Agent Nikki Badolato applied for a search warrant to search the defendant's ZTE smart cell phone and it was authorized by Magistrate Judge Nannette Baker.   The ZTE cell phone was taken to the FBI computer forensic examiner David Howe for examination.   On the defendant's ZTE cell phone, Examiner Howe located images of S.J.'s in a lascivious display of her genitals, a video of S.J. performing oral sex on a male, two videos of S.J. engaged in sexual intercourse with a male, and a video depicting S.J.'s genitals. Also on the cell phone were text messages between the defendant and S.J. that reference S.J. having to have sex for money.   Also, there is a text messages exchange between the defendant and Brandi, in which Brandi confronts the defendant about his "underage girlfriend." There is also a text message to the defendant from "Trinna" referencing sex acts between the defendant, the victim, and Trinna. An examination of the internet history on the phone revealed activity on the website "backpages.com."   Examiner Howe located photographs of the victim in the defendant's apartment on the phone in which is she is only wearing a towel. There are photographs on the cell phone of the victim at defendant's place of employment, Domino's Pizza. Further, there is evidence on the phone that it belonged to the defendant including: "selfie" type photographs of the defendant, his email address/account(ceoofmajorplayerent@gmail.com), a photograph of his work schedule at Domino's, and a photograph of a list of phone numbers with the ZTE cell

phone number for the defendant listed as his phone number.

In May of 2017, the victim was interviewed by FBI Special Agent Nikki Badolato regarding the allegations against the defendant. She was consistent with her earlier interview. S.J. was shown the images of child pornography from the ZTE cell phone and confirmed for SA Badolato that she is the female child depicted in this images. S.J. told SA Badolato that she remembered that the owner of Pure Pleasure called the defendant by the nickname, "New York." S.J. also remembered during of the trips to Pure Pleasure, S.J. had to perform sex acts on another women "Latrina" while other people watched. Later, once the videos had been discovered on the ZTE cell phone, the victim identified herself as the child performing sex acts on the defendant in those videos.

e.  <u>DNA Analysis</u>

The sexual assault kit and all seized clothing were taken to the Missouri State Highway Patrol Crime Laboratory.   DNA Analysist Kristina Mehl of the Highway Patrol compared a swab she had of the defendant's DNA to a stain consistent with seminal fluid on S.J.'s jean shorts.   The result of the testing showed the stain on the jeans shorts contained a mixture of DNA from S.J. and the defendant.   There was also an indication of a third individual DNA profile in the stain, but it was too small of amount of genetic material to develop a profile.   No semen was detected on the swabs from S.J.'s mouth or vagina.

f.  <u>Cell Site Historical Data Analysis</u>

On or about January 25, 2018, the FBI SA Badolato applied for and received a search warrant for the defendant's historical cell site data.   It was served upon Sprint.   Sprint

responded and sent the defendant's historical cell site data for his phone number to the FBI. This

data shows which cell phone towers in the St. Louis and Farmington, Missouri areas transmitted

the defendant's cell phone calls between August 10th and September 9th of 2016.   FBI Cellular

Analysis Expert Bastian Freund then interpreted the data, plotted, and mapped it.   The historical

cell site data from the defendant's cell phone corroborates the victim's testimony because it

includes data that shows the following. On August 10, 2016, the defendant's ZTE cell phone was

in the Farmington, Missouri, area near the victim's high school, her home, and the defendant's

apartment. On August 14, 2016, the cell towers indicate that the defendant's cell phone was near

a comedy club in Florissant, Missouri and near Pure Pleasures at 2626 North Broadway, St.

Louis, Missouri.   On August 21, 2016, the defendant's cell phone was near the Galleria Mall.

On September 4, 2016, the defendant's cell phone was at or very close to the Oz Nightclub in

Sauget, Illinois.

g.  Defendant's Prior Conviction for Statutory Rape and Sodomy.

On January 11, 2001, the defendant pled guilty to Statutory Rape 2nd Degree and

Statutory Sodomy 2nd degree in St. Louis County Circuit Court under cause number 2100CR-

04925.   After violating probation, the defendant was ultimately sentenced to four (4) years in

the Missouri Department of Corrections. This conviction stemmed from an incident at the

Northwest Plaza Mall in 2000, in which the defendant, who was twenty-one years old at the

time, had sex with a fourteen-year old girl. The defendant was working at the mall and the

fourteen year old victim had frequented the store where the defendant worked.   Specifically, on

April 8, 2000, while walking through the mall with the victim, the defendant pulled her into a

restroom, pulled her pants down, and penetrated her with finger and penis. The victim reported she told the defendant "no" during the encounter and she reported it to the police the same day.

The defendant is a registered sex offender in Missouri due to the prior conviction. The defendant also prior convictions for failing to register as a sex offender. Use of the defendant's prior conviction at trial with be discussed further in the Government's motion for 404(b) evidence.

## LEGAL ANALYSIS

A.   <u>Elements of the Offense of Sexual Exploitation of a Minor/Production of Child Pornography.</u>

The Indictment charges defendant in Count One through Three with Sexual Exploitation of a Minor in violation of Title 18, United States Code, Section 2251(a). The essential elements of this violation of Title 18, United States Code, Section 2251(a) are: (1) defendant knowingly employed, used, persuaded, induced, enticed, and coerced a minor to engage in sexually explicit conduct, (2) for the purpose of producing a visual depiction of such conduct, and (3) the materials used to produce the visual depiction had been mailed, shipped, or transported across state lines or in foreign commerce by any means, including by computer or cellular phone.

 i.   Definition of Sexually Explicit Conduct.

"Sexually explicit conduct" is defined as actual or simulated sexual intercourse, including genital-genital, oral-genital, anal-genital, oral-anal, whether between persons of the same or opposite sex; masturbation; and the lascivious exhibition of the genitals or pubic area of any person. The definition of "sexually explicit conduct" includes the "lascivious exhibition of the

genitals or pubic area of any person." Title 18, United States Code, Section 2256(2)(A)(v). The

Eighth Circuit Court of Appeals held that when the child is nude or partially clothed, when the

focus of the depiction is the child's genitals or pubic area, and when the image is intended to

elicit a sexual response in the viewer, the depiction is lascivious."   United States v. Horn, 187

F.3d 781, 789 (8th Cir. 1999). "[E]ven images of children acting innocently can be considered

lascivious if they are intended to be sexual." United States v. Johnson, 639 F.3d 433, 440 (8th

Cir. 2011). In Johnson, the court explained how to determine whether images were "lascivious:"

> In determining whether images are "lascivious," we have referred to the criteria listed in
> United States v. Dost, 636 F.Supp. 828, 832 (S.D.Cal.1986), aff'd sub nom., United
> States v. Wiegand, 812 F.2d 1239 (9th Cir.), cert. denied, 484 U.S. 856, 108 S.Ct. 164, 98
> L.Ed.2d 118 (1987). The factors in Dost included:
>
> (1) whether the focal point of the picture is on the minor's genitals or pubic area;
> (2) whether the setting of the picture is sexually suggestive;
> (3) whether the minor is depicted in unnatural poses or inappropriate attire considering
> the minor's age;
> (4) whether the minor is fully or partially clothed or is nude;
> (5) whether the picture suggests sexual coyness or a willingness to engage in sexual
> activity; and
> (6) whether the image is intended to elicit a sexual response in the viewer.
> Id.

The Eighth Circuit Model Pattern Instruction "6.18.2252A 'Lascivious' Explained," is

modeled after the Dost factors.

In the instant offense, Count I is charged as a lascivious display of S.J.'s genitals. It is

anticipated that the victim will confirm that the photograph and video are of her genitals taken by

defendant. The images charged in Count I meet the Dost factors because the minor's genitals are

clearly the focus of the images, shown in an unnatural pose, and meant to elicit a sexual

response.

The video charged in Count II depicts the minor victim performing oral sex on a male, most likely the defendant. This video, which was located on the defendant's cell phone, meets the definition of sexually explicit conduct because not only does it show a sex act, it depicts lascivious exhibition of the genitals or pubic area of any person.

The videos charged in Court III depict the minor engaged in vaginal intercourse, which is listed under the definition of sexually explicit conduct.   Again, these images and videos of the minor engaged in sexually explicit conduct were located on and taken by the defendant's ZTE cell phone.

ii.    The materials used to produce the visual depiction had been mailed, shipped, or transported across state lines or in foreign commerce.

The ZTE Cell Phone has been mailed, shipped, or transported across state lines or in foreign commerce by any means.    Use of material that has crossed state lines is sufficient to provide a jurisdictional nexus and show an effect on interstate commerce. United States vs. McCloud, 590 F.3d 560 (8th Cir.) at 569 states, "In *Fadl,* the defendant asserted that § 2251(a) was unconstitutionally applied to his case because he did not transmit any images of child pornography across state lines and the government presented no evidence that he had intended to do so. 498 F.3d at 865–66. In rejecting the defendant's argument, we cited the defendant's acknowledgment "that he used cameras that had crossed state lines to take the photographs." *Id.* We observed that this court "has on a number of occasions held that the use of a camera that has moved in interstate commerce provides a sufficient jurisdictional nexus to punish the production of child pornography under the Commerce Clause." *Id.* (citing *United States v. Mugan,* 441 F.3d

13

622 (8th Cir.2006) (holding that federal statute prohibiting local production of child pornography using materials that had moved in interstate commerce was not unconstitutional as applied to defendant; defendant had taken digital pictures of himself engaging in intercourse with his 13–year–old daughter and then stored images on digital memory card, which had previously been transported in interstate commerce, and storage of images on digital card placed them on medium which would permit immediate and widespread dissemination over the internet)).”

ZTE cell phones are not manufactured in the state of Missouri, thus the cell phone traveled in interstate commerce.   ZTE is a Chinese company and their cell phones are manufactured outside of the United State so the cell phone also traveled in foreign commerce. The ZTE cell phone at issue in this case has "Made in China" inscribed on itself.

The device itself is self-authenticating. An inscription on the device itself that it was produced outside of the United States is enough. The First Circuit upheld a defendant's conviction when the element of "interstate commerce" was proven by the government with the inscription "made in China" on the thumb drive containing the child pornographic material. "

> The district court rightly considered the fact that inscriptions indicating foreign origin are regulated, *see* 19 U.S.C. § 1304, and federal law prohibits false or misleading designations of origin, *see* 15 U.S.C. § 1125(a). Moreover, under the federal rules of evidence trade inscriptions are self-authenticating, Fed.R.Evid. 902(7), meaning they "require no extrinsic evidence of authenticity in order to be admitted," Fed.R.Evid. 902. An authentic inscription, of the kind made regularly by manufacturers in accordance with federal law, bears significant similarity to other forms of evidence admissible under the enumerated hearsay exceptions. *See* Fed.R.Evid. 803(6) (records of regularly conducted activity), (9) (certain information reported to a public office in accordance with a legal duty). Common sense, too, suggests a low probability that someone would stamp "Made in China" on a device made in the United States and presumably marketed here. Certainly the record here contains no reason to think otherwise. As to the other prongs of Rule 807(a), Burdulis's new arguments are largely perfunctory and provide no cause to treat as plain error any doubt that the inscription was more probative than other evidence reasonably available to the government or that admission of the evidence served

14

the interests of justice.   United States vs. Burdulis, 753 F.3d 255, 263-264 (2014).

B.   Sex Trafficking of a Minor

In Court IV, the defendant is charged with Sex Trafficking of a Minor in violation of Title 18, United States Code, Section 1591(a)(1) and 1594. To sustain its burden of proof, the United States must establish the following:   (1) the defendant knowingly recruited, enticed, harbored, transported, provided, obtained or maintained by any means S.J.; (2) that the defendant did so knowing or in reckless disregard of the fact that S.J. had not attained the age of 18 years and would be caused to engage in a commercial sex act; and (3)that the defendant's acts were in or affected interstate or foreign commerce.

Title 18, United States Code, Section 1591(a) was passed by Congress as part of the Trafficking Victims Protection Act of 2000 ("TVPA").   See Pub. L. No. 106-386, 114 Stat. 1464 (2000).   "The TVPA criminalizes and attempts to prevent slavery, involuntary servitude, and human trafficking for commercial gain."   United States v. Evans, 476 F.3d 1176, 1179 (11th Cir. 2007).   In passing the Act, "Congress recognized that human trafficking, particularly of women and children in the sex industry, is a modern form of slavery, and it is the largest manifestation of slavery today."   Evans, 476 F.3d at 1179 (discussing legislative history of Section 1591).

i.   Recruit, Harbor, Transport, Provide or Obtain.

In considering whether a defendant knowingly recruited, enticed, harbored, transported, provided, or obtained a person, the jury may use the ordinary, everyday definitions of those terms.   See Smith v. United States, 508 U.S. 233, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning").   Recruit means

15

to seek the services of or to enroll in support of oneself or others.   To entice means to attract or lure using hope or desire.   To harbor a person means to give or afford shelter or refuge to that person.   To transport means to transfer or convey from one place to another.   Provide means to supply or make available.   To obtain means to gain, acquire or attain.   <u>See</u> The American Heritage Dictionary of the English Language, New College Edition (1976).

In the present case, the evidence establishes that defendant recruited, enticed, harbored, transported, or obtained S.J.   The defendant brought the minor to his apartment, drugged her, and transported her to St. Louis on several occasions where he forced her to prostitute herself. The defendant let S.J. stay in his apartment for almost one month while he was prostituting her.

ii**.**      Reasonable Opportunity to Observe the Victim.

In determining whether the defendant knew or acted in reckless disregard of the fact that a victim had not attained the age of eighteen (18) years, a defendant has a reasonable opportunity to observe the victim if the defendant had an in-person, face-to-face interaction, with the victim. <u>See</u> <u>United States v. Booker</u>, 447 Fed. Appx. 726, 727 (7th Cir. 2011); <u>United States v. Robinson</u>, 702 F. 3d 22, 35 (2nd Cir. 2012).

In the present case, the evidence shows that defendant had a reasonable opportunity to observe S.J. as he saw her almost everyday for a month while S.J. lived with him at his apartment.   Further, he had reasonable opportunity to observe S.J. as he spent time with her in the car driving her to St. Louis, Missouri frequently. The defendant also picked up S.J. from the high school she attended in Farmington.   S.J. alleges she told the defendant her age. Furthermore, he had sex with S.J. on several occasions. The defendant had a reasonable opportunity to observe that the victim was a minor under the age of 18 years.

iii.    Commercial Sex Act.

The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.   The thing of value may be money or any other tangible or intangible thing of value that may be given to or received by any person, regardless of whether the person who receives it is the person performing the commercial sex act.   18 U.S.C. § 1591(a)(1) and (c)(1); United States v. Williams, 705, F.2d 603, 623 (2d Cir. 1983) (construing "anything of value" language broadly in context of bribery statute).   In the present case, S.J. made money from "johns" as a result of her prostitution activities and all of the money was ultimately given to defendant.

iv.    Interstate Commerce.

Courts have held that the internet and cell phones are a means or facilities of interstate commerce. See, e.g., United States v. Barlow, 568 F.3d 215, 220 (5th Cir. 2009) ("it is beyond debate that the Internet and email are facilities or means of interstate commerce"); United States v. Jacques, 2011 WL 1706765 (D. Vt. 2011) (same); United States v. Giordano, 442 F.3d 30, 39-40 (2d Cir. 2006) (cell phones are a facility or means of interstate commerce), United States v. Willoughby, 2014 321885, *10 (6th Cir. 2014) (same).   In United States v. Corum, 362 F.3e 489, 493 (8th Cir. 2004), the Court of Appeal for the Eight Circuit held that "it is well-established that telephones, even when used intrastate, are instrumentalities of interstate commerce.   See also, United States v. Evans, 476 F.3d 1176 (11th Cir. 2007)(finding that the interstate commerce element was met in a Section 1591(a) case where no prostitutes crossed state lines but hotels, phones, and condoms manufactured out of state were involved and the United States does not need to prove that the defendant knew his actions were in or affecting interstate commerce);

United States v. Myers, 430 Fed. Appx. 812, 816 (11th Cir. 2011) ("knowingly" does not modify the interstate commerce prong).

In the present case, the defendant routinely used a cell phones to set up "dates" with for the victim and to allow defendant to check up on the victim while she were working.   The defendant also used the cell phone to communicate with S.J. and to encourage her to continue having sex for money to pay their bills.

## WITNESSES AND EXHIBITS

1.   Anticipated Witnesses

    a.   S.J.

At trial, S.J. will testify about her relationship with the defendant, including the she worked as a prostitute for the defendant.   She will describe her recruitment by the defendant and identify the defendant as the person who directed her prostitution activities and to whom she gave the money that she earned while working as a prostitute.   S.J. will also describe how she gave the money to the defendant that she made from having sex with strangers and how the defendant gave her food, shelter, clothing, and drugs so that she could continue to work and earn money for the defendant.   There is a text message exchange between the victim and the defendant that confirms that the defendant was prostituting the victim to pay his bills. The victim will also identify the defendant's voice, which can be heard in the two of the videos of child pornography.

    b.   Carmen Coleman

Carmen Coleman is S.J.'s mother. She will report that she had little contact with S.J.

18

during the time S.J. was with the defendant. She attempted to report S.J. as a missing child, but did not find law enforcement cooperative. On or about September 6, 2016, she found out where S.J. was and went to the defendant's apartment with her husband to rescue S.J.   Ms. Coleman then took S.J. to the hospital. Ms. Coleman may also testify that she turned over to the police a bag of clothing worn by S.J. when S.J. was with the defendant.

       c.   <u>SANE Nurse Kathy Ferguson</u>

Kathy Ferguson is a nurse at Parkland Hospital in Farmington, Missouri.   She has received specialized training in treating patients reporting sexual assault. She will testify that the victim came into the hospital on or about the early morning hours of September 7, 2016. Nurse Ferguson performed a sexual assault kit (also known as a "rape kit") on the victim. She took photographs of the victim and documented the victim's injuries.

       d.   <u>Law Enforcement Witnesses</u>

          i.   Retired Farmington Police Detective Sargent Tim Porter will testify about how he was assigned to investigate this case. He first interviewed the victim at the police station. He told Lt. Crites to go by the defendant's home to investigate what the defendant was doing. He executed a state search warrant at the defendant's apartment. Further, he did two interviews of the defendant. At this point, the government is not intending to introduce the defendant's statements, however, if the defendant decides to testify, the government may use the statements to impeach the defendant if his story were to differ. Lastly, Sgt. Porter seized and executed a state search warrant on the defendant's cell phones. Sgt. Porter only did, what is considered a "logical" examination of cell phones with his forensic software and did not perform a full examination.   (FBI Analyst David Howe did perform a full forensic analysis of the cell phone.) Sgt. Porter conveyed the sexual assault kit

and the victim's clothing to the Missouri Highway Patrol Lab for DNA testing.

   ii. Lt. Jeffrey Crites from the Farmington Police Department will testify about that on September 7, 2016, Sgt. Porter asked him to drive by the defendant's apartment as part of their investigation.   While at the defendant's apartment complex, he saw the defendant loading clothing into his car, the defendant then fled from police when they attempted to pull him over to arrest him.   Lt. Crites will testify that after the defendant led law enforcement on a high-speed chase, defendant was arrested, and his car was towed.   The next day Lt. Crites performed an inventory search of the defendant's car and located 3 cell phones, as well as, identification documents belonging to the defendant.   Lt. Crites secured the cell phones at the Farmington Police Department.   Lt. Crites took photographs of the defendant's car.

   iii. Either Desloge Officer Jacob Sitton or Clayton Police Officer Todd Shearrer will testify that the defendant led the police on a high speed chase out of Farmington, through Bonne Terre, and into Jefferson County on September 7, 2016. After his car was rendered un-drivable by spike strips, the defendant ran from his car and was taken into custody by Officers Sitton and Shearrer.

   iv. Missouri State Highway Patrol DNA Analyst Kristina Mehl will testify that she received the sexual assault kit, and victim's clothing in this case. Analyst Mehl was able to develop DNA profiles on a pair of the victim's shorts and compared it against a buccal swab obtained from the defendant. Analyst Mehl will testify that the DNA mixture on the shorts is a mixture of the victim's and the defendant's DNA. Specifically, Analyst Mehl calculated that the mixture is 30.03 octillion times more likely to be from S.J. and the defendant than from S.J. and any unknown, unrelated individual.

   v. FBI Special Agent Nikki Badolato is the case agent for this case. Agent Badolato will testify as a summary witness at the trial. Her testimony will include a

time line of the events that correspond to the cell phone.   Agent Badolato can identify the defendant's voice and may testify that the defendant can be heard talking in at least one of the videos of child pornography.   Agent Badolato took a DNA buccal swab of the defendant and sent it to the Missouri State Highway Patrol for DNA comparison testing.

　　　　2.   <u>Expert Witnesses</u>

A witness who is "qualified as an expert by knowledge, skill and experience" may present expert testimony if his or her specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.   Fed. R. Evid. 702; <u>United States v. Solorio-Tafolla</u>, 324 F.3d 964, 966 (8th Cir. 2003), *citing* <u>United States v. Molina</u>, 172 F.3d 1048, 1056 (8th Cir. 1999); See also, <u>United States v. Espinoza,</u> 827 F.2d 604, 612 (9th Cir. 1987), <u>United States v. Brooks</u>, 610 F.3d 1186, 1195-1196 (9th Cir. 2010), <u>United States v. Anderson</u>, 560 F.3d 275, 281-282 (5th Cir. 2009).   The admission of expert testimony is a matter within the sound discretion of the trial court.   <u>United Stated v. Kinsey</u>, 843 F.2d 383, 387-89 (9th Cir. 1988); <u>United States v. Anderson,</u> 813 F.2d 1450, 1458 (9th Cir. 1987).

During its case-in-chief, the United States anticipates calling the following expert witnesses with respect to the following subjects:

　　　　a.   <u>Pimping and Prostitution</u>:

　　　 The government expects Det. Lynda Stott to testify at trial in order to aid the jury in understanding the *modus operandi* of pimps, including the recruitment of prostitutes, methods of establishing power and control over prostitutes, the relationship between a pimp and his prostitutes, and the nature of the prostitution "game."   Detective Stott will also testify about

the vocabulary unique to prostitution.   The testimony of Det. Stott is relevant given that "[b]y and large, the relationship between prostitutes and pimps is not the subject of common knowledge."   United States v. Taylor, 239 F.3d 994, 998 (9th Cir. 2001).

Such expert testimony is admissible at trial to assist the jury in understanding the evidence and to determine a fact in issue.   See Brooks, 2010 WL 2680982, at *4; see also Taylor, 239 F.3d at 998.   In Brooks, the court admitted testimony of a police detective with approximately eight years of training and experience, including two and a half years as a vice detective who had conducted multiple interviews of prostitutes and pimps and been involved in more than twenty child prostitution investigations.   Det. Stott has similar qualifications.

  b.  Historical Cell Site Data

FBI Special Agent Bastian Freund is a member of the FBI's Cellular Analysis Survey Team (CAST).   SA Freund has over 700 hours of training in cellular networking, radio frequency technology, and historic cellular records interpretation.   Through his training and the on-the-job case experience, he has successfully used cellular telephone analysis to locate fugitives, victims, missing children, and obtain evidence.    It is anticipated that SA Freund will testify that he reviewed the historical cell site data in this case that is associated with the defendant's cellular phone.   That data confirms the victim's report to police.   It is anticipated that SA Freund will testify about the locations of the defendant's cell phone between the dates of August 10 and September 7, 2016.   SA Freund's opinions are based on his individualized education, training, and experience.

  c.  Computer Forensic Evidence.

FBI IT Specialist David Howe will testify about his forensic examination of the cellular phone seized from the defendant. His testimony will include his background, training and experience; an explanation of the findings from the cell phone, and an identification of where items were found on the cellular telephone, including relevant photographs, text messages, emails, and other materials including the produced child pornographic images and videos of S.J.

3.     Exhibits

The United States' intends to introduce at least fifty (50) exhibits into evidence.   The exhibits consist of photographs, videos, text messages, medical records, birth certificate, DNA, the cell phone, email account information, and cell site historical data. The main exhibits, of course, are the produced child pornographic images and videos of S.J. from the defendant's cell phone. At trial, these exhibits will be introduced first with the victim and then will the forensic analyst David Howe. The government plans to have them in power-point type presentation where the images will only be visible to the jury for a very short period of time before a blank side appears. There are four (4) videos of child pornography that will have to be played for the jury; however, all four videos are short, lasting less than 30 seconds each.

In order to establish the ZTE cell phone belonged to the defendant, "selfie" style photographs of the defendant from the cell phone, as well as, text messages, social media applications, photographs of the defendant's work schedule, and relevant, identifying emails of the defendant will also be introduced through the forensic examiner.   Text messages from the cell phone that corroborate the prostitution activities, locations, and evidence relevant to this case will also be introduced at trial.

In addition to the physical evidence of the crimes alleged in the indictment, documents

or items found in a defendant's possession are admissible as either adopted admissions or to show the circumstantial relationship of the defendant to the documents.   United States v. Ospina, 739 F.2d 448, 451 (9th Cir. 1984); United States v. Enriquez-Estrada, 999 F.2d 1355, 1360 n.2 (9th Cir. 1993); United States v. Huguez-Ibarra, 954 F.2d 546, 552-53 (9th Cir. 1992)(notebooks and car payment receipt admissible as non-hearsay); United States v. Mejias, 552 F.2d 435, 446 (2d Cir. 1977)(hotel receipt, luggage invoice and travel agency business card seized from defendant admissible as non-hearsay); United States v. Campbell, 466 F.2d 529, 530-31 (9th Cir. 1972)(per curiam).

An exhibit list will be filed prior to the start of trial.   In addition, a copy of the exhibits that the government intends to admit into evidence will be provided to the Court and the defendant.   To the greatest extent possible, the government intends to use presentation software when presenting its case.   A binder of the original documents will be available for the witnesses and also for the jury to take into the jury room.

## **EVIDENTIARY ISSUES**

1.   Age of the Victim

The charged offenses includes an element requiring proof that the victim was under the age of 18 at the time the offenses were committed.   The government intends to prove the age through testimony of S.J., as well as through her birth certificate.   See Hilliard v. United States, 121 F.2d 992, 996 (4th Cir. 1941)(to establish victim's age the government offered a certified copy of the birth certificate); United States v. Austrew, D.C.Md. 1962, 202 F.Supp. 816, affirmed 317 F.2d 926 (birth certificate of girl, who was allegedly transported in interstate commerce for immoral purposes, was admissible to show that she was under

eighteen, though girl's first and middle names were transposed on birth certificate, where it was properly sealed and certified).

2.   Photographs

The government intends to introduce photographs of the victim and the defendant, as well as photographs of a locations (i.e. Pure Pleasure) where the victim engaged in commercial sex acts.   Under Federal Rule of Evidence 90l(a), testimony by a witness that a photograph fairly and accurately depicts that scene at some relevant time is a sufficient basis for admission of the photograph.   See United States v. Brannon, 616 F.2d 413, 416 (9th Cir.), cert. denied, 447 U.S. 908 (1980); Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966, 973-74 (2d Cir. 1985) (and cases cited therein).

3.   Statements Offered by the Defendant

If the government chooses not to introduce statements made by the defendant, the defendant may not introduce those statements as they would be hearsay because they would not be offered by a party-opponent.

4.       Voice Identification Testimony

The government anticipates that there will be testimony from either FBI SA Badolato or S.J. that the defendant's voice can be heard during one of the videos of child pornography. Witness lay testimony can be admitted to identify a defendant's voice on a recorded conversation. *United States vs. Mendiola*, 707 F.3d 735 (7th Cir. 2013).   The Court in *Mendiola* cited, "It is Federal Rule of Evidence 901(b), however, which enunciates the amount and quality of evidence sufficient to satisfy the requirement of voice identification.   It states that the following is sufficient evidence of voice identification: 'an opinion identifying a person's

voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker.' *Id.* The accompanying notes state that 'aural voice identification is not a subject of expert testimony.'" *Id.* at 739.

     5.   <u>Use of Nicknames</u>

The victims in this case know the defendant by his given name, as well as by his nicknames, including "Mack," "New York," and "Ace."   The government intends to elicit this information from any witness who might only know the defendant by one of his nicknames, and cannot identify or refer to him by his proper name.

     6.   <u>Reciprocal Discovery</u>

To date, the government has provided numerous police reports, documents, relevant text messages, cell site data, photographs, work records, DNA reports, and interviews in discovery to the defense.   The government also showed the child pornography images and videos to the defendant and defense counsel.   The government has requested reciprocal discovery, but has not received any discovery from the defendant.   Should the defendant seek to introduce any evidence that should have been provided to the government as reciprocal discovery, the Court should exclude it pursuant to Rule 16(d)(2) of the Federal Rules of Criminal Procedure.

     7.   <u>Presentation of Witnesses</u>

The United States intends to present the evidence in this case in a generally sequential fashion.   However, it may become necessary due to scheduling issues to call a witness out of order.

## CONCLUSION

The foregoing is a summary of points, issues, and testimony the government anticipates may arise at trial.   Should any legal issues arise that have not been covered in this trial brief, the Government respectfully requests leave to submit such further memoranda as may be necessary.


Respectfully submitted,
JEFFREY B. JENSEN
United States Attorney


_____/s/ Colleen C. Lang_____
COLLEEN C. LANG #56872MO
Assistant United States Attorney
111 South 10th Street, Rm. 20.333
St. Louis, Missouri 63102
(314) 539-2200


## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2014, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Robert Herman, attorney for defendant.


_____/s/ Colleen C. Lang_____
COLLEEN C. LANG, #56872MO

27